[No. 37607.   Department Two.   August 26, 1965.]

HENRY J. GANNON, *Respondent*, v. RALPH E. EMTMAN, *Appellant*.[*]

*Reported in 405 P.2d 254.

*Sharpe, Twigg & Bennett,* by *Willard J. Sharpe,* for appellant.

*Moe & Kight (Milburn D. Kight,* of counsel), for respondent.

HAMILTON, J.—Appellant, Ralph E. Emtman, Jr., acquired Unit 50, Irrigation Block 88, Columbia Basin Project, in the fall of 1961. In readying it for the 1962 farming season, he and his father, Ralph E. Emtman, Sr., who was financially assisting his son, decided to level and plane the northern half of the unit for rill or surface irrigation, and to install a sprinkling system to irrigate the southern half. Both father and son were experienced dry-land farmers, but were relatively inexperienced with irrigation farming. They obtained the services of Jake Holland, engineer for the Adams County Extension Service, who recommended the northern half be levelled and planed to a slope of two-tenths of a foot per 100 feet. Mr. Holland surveyed and helped stake the premises accordingly. In the course of Mr. Holland's calculations, it was estimated that leveling of the high spots would supply approximately 45,000 yards of soil which, in turn, would be sufficient to fill the low spots and provide the ditch pads.

Respondent, Henry J. Gannon, a land-leveling contractor, was engaged in leveling an adjacent tract. He observed the preparations on appellant's unit and approached Mr. Emtman, Sr., relative to obtaining the leveling and planing job. Negotiations ensued, during the course of which respondent was furnished with the maps and engineering data prepared by Mr. Holland. Respondent suggested that the work be done on an hourly or yardage basis; however, Mr. Emtman, Sr., desired a fixed-price contract. Respondent estimated, upon the basis of Mr. Holland's maps and work sheets, there would be 47,000 to 48,000 yards of soil available for fill. Figuring the job at 13 cents a yard, respondent split the difference between the 45,000 and 48,000 yardage estimates and agreed to do the work for $6,000. Mr. Emt-

man, Sr., took the results of their discussions to an attorney and a contract was drawn, which, in pertinent part, reads:

1. *Purpose.* The purpose of this Agreement is to set forth the terms of employment whereby the Owner employs the Contractor to level and plane certain real estate to prepare said real estate for farming by surface irrigation under conditions commensurate with the usual practices of farming in the Columbia Basin Project, Washington.

. . . .

6. *Changed Conditions and Undercutting.* The parties hereto agree that there exists upon the premises approximately 45,000 yards of earth to be moved in accomplishing the purpose of this Agreement, and in establishing two (2) fields for irrigation purposes upon the premises. In the event that the Contractor, in the performance of this Agreement, discovers sub-surface or latent conditions which are not now anticipated and which will require undercutting to correct, the Contractor agrees to cease operations and immediately notify the Owner of same. If the Owner desires to accomplish undercutting, he shall direct the Contractor to proceed at the hourly rate of Sixteen and 50/100 ($16.50) Dollars, for a D-8 Cat., said payment to be in addition to the payment hereinafter set forth.

7. *Terms of Payment.* The total contract price to be paid by the Owner to the Contractor hereunder is the sum of Six Thousand and no/100 ($6,000.00) Dollars payable as follows:

(a) The sum of Two Thousand Five Hundred and no/100 ($2,500.00) Dollars, at the time the Contractor's obligations under this Agreement have been fifty (50%) per cent completed;

(b) The sum of Two Thousand Six Hundred and no/100 ($2,600.00) Dollars, when the job has been entirely completed by the Contractor;

(c) The remaining balance of Nine Hundred and no/100 ($900.00) Dollars, when the premises have been tested by watering same to the satisfaction of the Owner. Said testing is to be accomplished as soon as is reasonably possible after the completion of the job; and

(d) The payments called for herein compose the contract price and do not include any additional costs involved in accord with the provisions of Paragraph 6., above.

The contract was signed by appellant and respondent on February 5, 1962, and work thereafter commenced. Part way through the job, respondent encountered subsurface conditions requiring some undercutting.[1] Work ceased, Mr. Emtman, Sr., was called, and agreement was reached upon the extent of the undercutting to be done. The trial court, upon conflicting evidence, found that the extra dirt necessitated by the undercutting was taken from the southern half of the unit. As the work of leveling thereafter progressed, respondent ran short of fill dirt with which to accomplish the leveling to the required grade and to complete the ditch pads.

Although the evidence is in conflict as to what transpired between the parties, the trial court found as a fact that appellant Ralph E. Emtman, Jr., who was on the site, agreed that respondent should borrow dirt from the southern half of the unit and that respondent should be reimbursed for the added time and labor at an hourly rate of $16.50.

Upon completion of the leveling and planing, the first two payments called for by the contract had been or were paid. Appellant test watered the premises and, after some "touch up" work was performed at the expense of respondent, the remaining balance due on the contract price plus the additional cost incurred by the undercutting was tendered by separate checks to respondent, who received the checks but did not cash them because regulations of the Farmers Home Administration, holder of a mortgage on the premises, required a waiver of lien rights. Thereafter, respondent filed a notice of lien by which he claimed to be due the amounts represented by the checks and the sum of $1,518 as compensation for the added time and work of securing the additional soil from the southern half

---

[1]Undercutting is described in the evidence as the removal of excess rock and gravel in areas where such is found immediately under the surface of a high point. When such a condition is found to exist, the rock is removed and the area undercut to a foot below the proposed overall grade and filled in with top soil.

of appellant's unit, computed at the rate of $16.50 an hour. Respondent then commenced this action seeking foreclosure of his lien.

Appellant denied any amounts due and unpaid, and counterclaimed, alleging damages due to defective leveling, crop loss, and trespass and injury to the southern half of the unit.

At the conclusion of trial of the issues as framed, the trial court dismissed appellant's counterclaims, and entered judgment foreclosing respondent's lien in the full amount claimed, assessing attorney's fees and costs, and establishing priority of the lien over the Farmers Home Administration's mortgage.

On appeal, appellant challenges (1) the findings of fact upon which the trial court predicated dismissal of his counterclaims, and (2) the admission of evidence and the trial court's findings, conclusions, and judgment relative to a supplemental oral agreement allowing respondent additional compensation for obtaining the needed fill soil to complete the leveling and ditch pads.

▆ In support of the first contention, appellant asserts findings of fact Nos. 6[2] and 7[3] are not supported by substan-

---

[2] "After the leveling and planing was accomplished, in accordance with the written and oral agreement between the parties, Defendant Emtman pre-irrigated the unit and some touch up work was done by Plaintiff in accordance with the written contract. Defendant Emtman, who was inexperienced in irrigation farming, then planted red beans between June 15 and June 30, 1962 and water was applied at said crop between July 15 and July 30, 1962. The unit irrigated well for first year ground and any ponding and dry spots on said property was not caused by the work or lack of work performed or not performed by Plaintiff, but were due to settling of soil, removal of rocks by Defendant Emtman, the rocky condition of the soil and improper corrugations." Finding of fact No. 6.

[3] "The red beans were harvested by Carl Stubbe and Les Peterson and some beans were not cut by Defendant Emtman for combining or harvesting because of the rocky condition of the soil. A portion of the beans were rained upon before they were harvested which affected their production or yield, but the crop was average under the conditions that existed. As the unit was leveled and planed in accordance with the written contract and oral agreements between Plaintiff and Defendant Emtman, Plaintiff was in no way responsible for Defendant Emtman's crop yield." Finding of fact No. 7.

tial evidence. In essence, he asserts that the evidence establishes that the unit levelled did not irrigate properly and that he suffered a crop yield below normal. There is, however, substantial contradictory evidence which the trial court chose to accept and upon which the trial court predicated the challenged findings. Under such circumstances, we will not substitute our judgment for that of the trial court. *Macchia v. Salvino*, 64 Wn.2d 951, 395 P.2d 177 (1964); *Williams v. Spring*, 64 Wn.2d 908, 395 P.2d 180 (1964); *Morris v. Rosenberg*, 64 Wn.2d 404, 391 P.2d 975 (1964).

By his second contention, appellant basically asserts that the oral agreement, as found by the trial court, that respondent was to be allowed additional compensation for obtaining the fill dirt necessary to complete the job from the southern half of the unit was without consideration.

In support of this contention, appellant relies upon the general rule to the effect that a promise to pay additional compensation for the doing of, or a promise to do, that which the promisee is already under contractual obligation to do is lacking in consideration. *Westland Constr. Co. v. Chris Berg, Inc.*, 35 Wn.2d 824, 215 P.2d 683 (1950); *Harris v. Morgensen*, 31 Wn.2d 228, 196 P.2d 317 (1948); *Queen City Constr. Co. v. Seattle*, 3 Wn.2d 6, 99 P.2d 407 (1940).

There are, however, some exceptions to this general rule. One of the recognized exceptions is that there is consideration for a subsequent contract which involves the doing of something which was not either expressly or by implication a part of the existing contract or was not contemplated by the parties as falling within the terms of the existing contract. *Thayer v. Brady*, 28 Wn.2d 767, 184 P.2d 50 (1947); Restatement, Contracts § 84(c) (1932); 17 C.J.S. *Contracts* § 112(c) (1963).

In the instant case, all parties believed that there would be sufficient dirt available upon the northern half of the unit to complete the leveling, planing, and ditch padding job in accordance with the engineer's specifications. Thus, the parties contemplated that the work, under the existing

contract, would be accomplished by simply moving the dirt from the high points to the low points within the unit, with sufficient excess to form the ditch pads. They did not contemplate or intend that it would be necessary to haul dirt from another source to complete the job. When this eventuality arose, the evidence indicates they were confronted with at least four alternatives: (1) To lower the overall grade, thus obtaining more dirt from the high points with which to fill the reduced low points; (2) to borrow dirt from a selected area or pit on the premises being levelled; (3) to borrow dirt from adjacent premises; or (4) to abandon the leveling project. They chose the third alternative, which, under the findings of the trial court, required the digging, hauling, and spreading of approximately 4,000 cubic yards of dirt taken from areas of the southern half of the unit up to one-half mile off site, and the expenditure of 92 hours of machine time.

We are satisfied, as was the trial court, that appellant's oral agreement to pay for the additional work involved in obtaining the necessary soil was supported by sufficient consideration.

▇ The judgment is affirmed. Respondent will be awarded his costs on appeal, and the cause will be remanded to the trial court to consider respondent's motion for an award of attorney's fees on appeal. *Elmore v. Graystone of Centralia, Inc.*, 63 Wn.2d 250, 387 P.2d 75 (1963); *Hopkins v. Ulvestad*, 46 Wn.2d 514, 282 P.2d 806 (1955).

HILL, DONWORTH, and WEAVER, JJ., and MACIVER, J. Pro Tem., concur.